UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
APR 10 2017
RECEIVED

ORIGINAL

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED APR 10 2017
CLERK

UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

ABC AEROLINEAS, S.A. de C.V., d/b/a INTERJET,
Petitioner
v.
UNITED STATES DEPARTMENT
OF TRANSPORTATION,
Respondent

Case No. 17-1115

ORIGINAL

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. § 46110, Federal Rule of Appellate Procedure 15(a), and other applicable authority, petitioner ABC Aerolíneas, S.A. de C.V., d/b/a Interjet ("Interjet") hereby petitions for review of Final Order 2017-4-6 issued by the United States Department of Transportation ("DOT") on April 10, 2017 in connection with the request of Delta Air Lines, Inc. and Aerovías de México, S.A. de C.V. for immunity from U.S. antitrust laws in order to operate a Joint Venture between the United States and Mexico (attached hereto). DOT Order 2017-4-6 is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, in excess of statutory authority, and without observance of procedures required by law.

The corporate disclosure statement required by Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1 is attached to this Petition.

Respectfully submitted,

Moffett B. Roller
(D.C. Bar No. 236398; Court of Appeals Bar No. 27053)
Washington Dulles International Airport
45005 Aviation Drive; Suite 200
Dulles, VA 20166
Phone: 202-331-3300
Fax: 202-331-3322

Attorneys for Petitioner
ABC Aerolineas, S.A. de C.V., d/b/a Interjet

Dated: April 10, 2017

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED APR 10 2017
CLERK

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED APR 10 2017
CLERK

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ABC AEROLINEAS, S.A. de C.V., d/b/a INTERJET,
Petitioner
v.
UNITED STATES DEPARTMENT OF TRANSPORTATION,
Respondent

Case No. 17-1115

**RULE 26.1 CERTIFICATE OF CORPORATE DISCLOSURE FOR PETITIONER ABC AEROLINEAS, S.A. de C.V., d/b/a INERJET**

ORIGINAL

Pursuant to Federal Rule of Appellate Procedure 26.1 and 26.1 of the Circuit Rules of the United States Court of Appeals for the District of Columbia Circuit, ABC Aerolíneas, S.A. de C.V., d/b/a Interjet ("Interjet") hereby discloses the following:

Interjet is a privately-held commercial airline operator. Interjet is not publicly held or traded.

Interjet certifies that the following officers, directors or trustees of Interjet have an interest in the outcome of this case or appeal:

- Mr. Jose Luis Garza Alvarez, Chief Executive Officer
- Mr. Luis Alejandro Beristain Mercado, Chief Financial Officer
- Mr. Francisco Javier Licea Ventura, Chief Operating Officer
- Mr. Luis Alberto Hernandez Garcia, General Counsel & Legal Vice President
- Mr. Oscar Arguello Ruiz, Technical Vice President
- Mr. Benjamin Mejia Ortiz, Operational Security Vice President

Interjet further certifies that the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of Interjet's stock, and other identifiable legal entities related to Interjet:

- Mr. Miguel Aleman Velasco
- Mr. Miguel Aleman Magnani
- Mr. Jorge Aleman Velasco
- Mr. Beatriz Aleman Velasco de Giron
- Galem, S.A. de C.V.
- Aleman Group

Respectfully submitted,

Moffett B. Roller
(D.C. Bar No. 236398; Court of Appeals Bar No. 27053)
Washington Dulles International Airport
45005 Aviation Drive; Suite 200
Dulles, VA 20166
Phone: 202-331-3300
Fax: 202-331-3322

Attorneys for Petitioner
ABC Aerolineas, S.A. de C.V., d/b/a Interjet

Dated: April 10, 2017

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 15(c) and Circuit Rule 15(a), I hereby certify that I have this 10th day of April, 2017, caused the foregoing Petition for Review and the Rule 26.1 Corporate Disclosure Statement to be served by U.S. mail in accordance with the Rules of this Court, upon:

U.S. Department of Transportation
Attn.: Mr. Paul M. Geier &
Mr. Christopher S. Perry
1200 New Jersey Avenue, SE
Washington, D.C. 20590

United States Department of Justice
Antitrust Division, Appellate Section
Attn.: Ms. Frances Marshall &
Mr. Robert B. Nicholson
950 Pennsylvania Ave., NW; Rm 3224
Washington, D.C. 20530

Hogan Lovells US LLP
Attn.: Mr. Robert Cohn
Counsel for Aeromexico
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004

Cozen O'Connor
Attn.: Mr. David Heffernan
Counsel for Alaska Airlines
1200 19th Street, NW
Washington, D.C. 20036-2412

Delta Airlines
Attn.: Mr. Christopher Walker
Director Regulatory & Int'l Affairs
1212 New York Ave., NW; Suite 200
Washington, D.C. 20005

American Airlines
Attn.: Mr. Howard Kass
Vice President - Regulatory Affairs
1101 17th Street, NW
Washington, D.C. 20036

Virgin America, Inc.
Attn.: Mr. Jonathan Foglia
Counsel for Virgin America
Zuckert Scoutt & Rasenberger
888 Seventeenth Street, NW; Suite 700
Washington, D.C. 20006

Kirsten & Young, PLLC
Attn.: Mr. David Kirstein &
Ms. Joanne Young
Counsel for Spirit Airlines &
Aeroenlaces Nacionales, S.A. de C.V.
(vivaAerobus)
800 17th Street, NW; Suite 1100
Washington, D.C. 20006

Holland & Knight LLP
Attn.: Ms. Anita Mosner
Counsel for
Concesionaria Vuela Compañía de
Aviación, S.A.P.I. de C.V. (Volaris)
800 17th Street, NW; Suite 1100
Washington, D.C. 20006

Southwest Airlines Co.
Attn.: Mr. Robert W. Kneisley
Associate General Counsel
919 18th Street, NW; Suite 600
Washington, D.C. 20006

Cooley LLP
Attn.: Mr. J. Parker
Counsel for Hawaiian Airlines, Inc.
1299 Pennsylvania Ave., NW; Ste 700
Washington, D.C. 20004

Eckert Seamans Cherin & Mellott, LLC
Attn: Ms. Evelyn Sahr
Counsel for JetBlue Airways Corp.
1717 Pennsylvania Avenue, NW
Washington, D.C. 20006

Crowell & Moring, LLP
Attn.: Mr. Steven Seiden
Counsel for United Airlines, Inc.
1001 Pennsylvania Avenue, NW
Washington, DC 20004

Moffett B. Roller
(D.C. Bar No. 236398; Court of Appeals Bar No. 27053)
Washington Dulles International Airport
45005 Aviation Drive; Suite 200
Dulles, VA 20166
Phone: 202-331-3300
Fax: 202-331-3322

Attorneys for Petitioner
ABC Aerolineas, S.A. de C.V., d/b/a Interjet

Dated: April 10, 2017

Order 2017-4-6
Served April 10, 2017

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 10th day of April, 2017

**Joint Application of**

**DELTA AIR LINES, INC.**
**AEROVIAS DE MEXICO, S.A. DE C.V.**

**Under 49 U.S.C. §§ 41308 and 41309 for Approval of and Antitrust Immunity for Alliance Agreements**

**Docket DOT-OST-2015-0070**

## FINAL ORDER

## I. SUMMARY

By this Order, the Department is finalizing, with minor adjustments, its tentative decisions in Order 2017-3-1 (March 2, 2017, the Show Cause Order) to direct the divestiture of 24 slot-pairs at Mexico City's Benito Juarez International Airport (MEX) and four slot-pairs at New York's John F. Kennedy International Airport (JFK), to the carriers proposed in that Order. These slot-pairs are being divested by Delta Air Lines, Inc. (Delta) and Aerovias de Mexico, S.A. de C.V. (Aeromexico) (together, the Joint Applicants) as a condition of a grant of antitrust immunity (ATI) from the Department for a joint venture covering air transportation between the United States and Mexico.

As discussed in more detail below, this determination is the product of a two-year administrative proceeding in which the Department has received extensive evidentiary submissions and has considered the viewpoints of a wide variety of stakeholders, including airlines, airports, and authorities of the Mexican government. Throughout this process, the Department has remained committed to a careful examination of the competitive environment and the public interest. Virtually all interested parties support the approach that the Department has adopted here, and the objections that have been raised by one airline, ABC Aerolineas, S.A. de C.V., d/b/a Interjet (Interjet) are not persuasive, and, accordingly, have been rejected by this Order after additional consideration and explanation as noted below.

## II. BACKGROUND

On December 14, 2016, the Department issued a Final Order approving and granting antitrust immunity for the proposed joint venture, subject to particular conditions, including a two-phase divestiture of slots at MEX and JFK to certain eligible carriers as determined by the

Department.[1] The purpose of the divestitures, as described in Orders 2016-11-2 and 2016-12-13 (November 4, 2016, the ATI Show Cause Order and December 14, 2016, the ATI Final Order, respectively), is to alleviate the competitive harm likely to result from the transaction and to ensure sufficient competition in the environment in which the joint venture will operate. On December 21, 2016, the Joint Applicants notified the Department that they accepted the Department's conditions, including the slot divestitures.[2]

On January 6, 2017, the Department issued Order 2017-1-6, instituting a competitive selection proceeding to assign the divested slots. Applications were due January 23, 2017, and answers and replies were due January 30, 2017, and February 6, 2017, respectively. In response to that Order, the Department received applications from six carriers. The Department issued a tentative assignment decision in the form of an Order to Show Cause (2017-3-1) on March 2, 2017. That Order established a pleading schedule requiring objection or comments on the Order be filed by March 13, 2017, and answers to objections be filed no later than March 22, 2017.

## III. SUMMARY OF RESPONSIVE PLEADINGS

The Department received seven comments from carriers and civic parties supporting the assignment of slots made in the Show Cause Order. In addition, the Department received comments from Interjet, which renews its objections to the eligibility criteria that the Department has applied to the assignment of those slots.

### A. SOUTHWEST

Southwest Airlines Co. (Southwest) filed comments supporting the Department's tentative assignment and urges that the Order be finalized as soon as possible. Southwest also supports the conditions that the Department tentatively imposed on the slots, including provisions regarding their subsequent transfer.[3] In its reply comments, Southwest reiterated that no party opposed the tentative grant of four slot-pairs to Southwest. Southwest also argues that the Department should not consider the request by Aeroenlaces Nacionales, S.A. de C.V. (VivaAerobus) to move one of its Phase Two slot-pairs from JFK-MEX to LAX-MEX, as the carrier was aware when applying for slot-pairs that it would not be possible to accommodate both of its requests given the prescribed divestiture limits at JFK. Regarding Interjet's objections, Southwest states that the carrier's concerns were thoroughly aired during the Department's evaluation of the ATI application and that the issues should not be reconsidered at this phase of the proceeding.

### B. JETBLUE

JetBlue Airways Corporation (JetBlue) filed comments supporting the Department's tentative decision and urging the Department to promptly issue a Final Order.

---

[1] *See* Order 2016-11-2 at 25; Order 2016-12-13 at 23.

[2] *See* Notice of the Joint Applicants, DOT-OST-2015-0070-0100, Dec. 21, 2016.

[3] *See* Answer of Southwest Airlines Co. to Order 2017-3-1, DOT-OST-2015-0070-0154, Mar. 13, 2017, at 2 (Interjet Comments and Objections).

**C. ALASKA**

Alaska filed a pleading supporting the Department's tentative decision, and noted that no carrier has objected to the Department's tentative assignment of MEX and JFK slot-pairs.[4] Alaska opposes VivaAerobus' request to move one of its Phase Two JFK-MEX slot-pairs to LAX-MEX. Alaska argues that, given the Department's concern about lack of competition on the JFK-MEX route established in the ATI phase of the proceeding, the Department should not grant VivaAerobus' request, thereby forfeiting one of the four new services that would otherwise be established on that route.

**D. VIVAAEROBUS**

VivaAerobus filed an answer stating that the carrier appreciates the Department's decision to award it slot-pairs to serve the MEX-LAS and MEX-JFK markets. Further, as required by the Show Cause Order, VivaAerobus included a revised request for slot-times at JFK. VivaAerobus also requests that the Department allow it to change one of its Phase Two JFK-MEX slot-pairs to LAX-MEX, but notes that it is prepared to operate both JFK-MEX services if its request is denied. In reply comments, VivaAerobus supports the Department's decision to exclude Interjet from eligibility for MEX slots. VivaAerobus states that the Department fully explored the eligibility of carriers for JFK and MEX slot-pairs and recognized Interjet's saturation in the MEX marketplace. VivaAerobus also requests that the Department reject any reconsideration of the ATI Final Order. Finally, VivaAerobus reiterates its request to move one of its Phase Two slot-pairs to the LAX-MEX market.

**E. VOLARIS**

Concesionaria Vuela Compania de Aviacion, S.A.P.I. de C.V. (Volaris) filed comments generally supporting the Department's tentative decision, but suggests that the Department grant Volaris its one remaining outstanding JFK request for Cancun (CUN) service, should the Department grant VivaAerobus' request for LAX service. Volaris also suggests that the Department be prepared to withdraw and reassign any slots that are not promptly used by the designated awardees.

**F. INTERJET**

Interjet also submitted a filing in this proceeding, styled as "Comments and Objections." Interjet "applauds" the Department's decision to award it its first-choice slot-pair at JFK, arguing that this outcome "will advance [the] goal of expanding competition in the JFK-MEX market."[5] However, Interjet reiterates its objections to its exclusion from eligibility for MEX remedy slots. Interjet argues generally that its exclusion does not advance any legitimate government interest in addressing antitrust concerns, that its exclusion was arbitrary, and that the Department has acted in excess of its statutory jurisdiction.

---

[4] Alaska notes that Interjet's objection is limited to its exclusion from eligibility at MEX, not the Department's tentative assignment. These issues are discussed in more detail below.

[5] *See* Comments and Objections of ABC Aerolineas, S.A. de C.V., d/b/a Interjet, to Order to Show Cause 2017-3-1, DOT-OST-2015-0070-0158, Mar. 13, 2017, at 2.

### G. OTHER COMMENTERS

The City and County of Denver (operator of Denver International Airport) filed comments supporting the Department's tentative decision to assign slots to Volaris for MEX-DEN service. Denver states that it is the only airport proposed in this proceeding that does not already have daily, year-round service to MEX.

The City of Houston Department of Aviation (operator of Houston-Hobby International Airport), filed comments supporting the Department's tentative decision to award slot-pairs to Southwest in order to provide additional service in the MEX-HOU market. Houston argues that the award of these slot-pairs will expand consumer options and competition not only at Houston-Hobby, but also in the overall Houston market, and will enhance low-fare connectivity to dozens of other U.S. destinations.

## IV. THE DEPARTMENT'S ANALYSIS AND THE OBJECTIONS OF INTERJET

### A. THE GRANT OF ATI AND THE SLOT REMEDY

The reasoning supporting the Department's grant of ATI and the conditions attached to the grant of ATI, including the slot remedy, have been discussed in extensive detail in the Department's prior orders, and need not be repeated in full here. However, by way of brief review, the Department's determination in this case is governed by the legal framework established by statute in 49 U.S.C. §§ 41308-09. Thus, under section 41308(b), "[w]hen the Secretary of Transportation decides it is required by the public interest, the Secretary . . . may exempt a person affected by the order from the antitrust laws" in appropriate cases. Consistent with that provision, and based upon our analysis, we determined that the Joint Applicants' request for immunity would not "substantially reduce[] or eliminate competition." *Id.* § 41309(b)(1). In particular, we conducted an analysis of the competitive effects of the arrangement at three levels of specificity: at the broad network level, the country-pair level, and the city-pair level. Our economic analysis led us to the conclusion that, subject to the remedies we planned to adopt, the Joint Application was consistent with the requirements of section § 41309(b)(1).[6]

Furthermore, we gave careful consideration to how the public interest would be affected by the approval of the Joint Application under sections §§ 41309(b) and 41308(b). We identified a variety of public benefits that would result from what Delta and Aeromexico proposed, permitting those carriers "to better align capacity with demand (through a wider range of available aircraft sizes)[.]"[7] We also anticipated that the Joint Venture would "improve connectivity between the United States and Mexico," and that "[t]he resulting enhanced network linkage, reduced travel times, and increased efficiency will be a net positive to consumers."[8] We also noted that our decision would "result[] in more attractive services for consumers in several important markets where other legacy carriers have a strong presence (e.g., Chicago, Dallas, Washington), and the potential development of an additional regional hub in Mexico to connect the U.S. to additional points in Mexico[.]"[9]

---

6 *See* Order 2016-11-2 at 18.

7 *Id.*

8 *Id.* at 19.

9 *Id.*

Notwithstanding these determinations, the Department also recognized that the Joint Application would present particular competitive concerns at JFK and MEX. In particular, "[t]he record demonstrates that non-incumbent carriers have had a difficult time acquiring viable slot times at both airports, and that it is unlikely that a market solution will present itself."[10] We therefore determined that conditions at this airport, including "concentration and barriers to entry," would "hav[e] a substantial impact on competition in the foreseeable future, unless appropriate conditions are imposed."[11]

To address this concern at these two specific airports, we concluded that it was appropriate to order slot divestitures as a condition of the grant of ATI. We sought to tailor this remedy to the facts and circumstances presented on the record. In so doing, we concluded that a divestiture of 24 slot pairs would be appropriate "to support new entry needed to discipline the coordinated services and planned growth of the joint venture."[12] We also limited our grant of ATI to a period of five years, noting that "[t]he competitive balance and the policies governing allocation of slots at MEX are fluid and the Department needs to retain the ability to fully reexamine the basis for granting ATI" within a reasonable period, to appropriately account for changing circumstances.[13]

Our decision to condition the grant of ATI with a slot divestiture remedy was not novel, but was instead consistent with our prior rulings in other cases, in which we employed this mechanism as a means of ensuring that the benefits of the transaction are realized by providing the means for sufficient competition, which further supports our determination here. We discussed these precedents at earlier stages of this proceeding,[14] but one significant example consistent with the exercise of our statutory authority was the 2002 American Airlines/British Airways antitrust immunity case. In that case, which considered the second application that the two carriers made for antitrust immunity, the Department tentatively directed American and British Airways to divest 16 slot-pairs at London's Heathrow International Airport (LHR) to specific carriers previously excluded from serving LHR, to introduce adequate network competition to ensure the benefits of that transaction.[15] In the most recent iteration of the application, the Department conditioned the grant of ATI to the oneworld alliance (of which American and British Airways are members) on the divestiture of four slot-pairs at London Heathrow.[16] Two of those pairs were to be used on the Boston-London market, and the other two were to be used more flexibly for US-London flights.[17] An eligibility determination was also made that limited carriers who could apply for and use the slots – in that case, oneworld alliance members and affiliates, even if

---

10 *Id.* at 14.

11 *Id.*

12 *Id.* at 21.

13 *See* Order 2016-12-13 at 27-28.

14 *Id.* at 14.

15 *See* Order 2002-1-12, Docket DOT-OST-2001-11029, Jan. 25, 2002. The case was dismissed after the applicants withdrew the application, prior to a final order being issued. *See* Order 2002-4-4, Apr. 4, 2002.

16 *See* Order 2010-7-8, Jul. 20, 2010.

17 *Id.* at 3.

they were arms-length competitors, were not allowed to apply for the slots.[18] The European Commission, which was also considering approving the venture, devised procedures for the slot divestiture at London Heathrow that we concurred with, thereby eliminating any need for a parallel proceeding. In those proceedings, as here, the facts and circumstances determine the appropriate approach and remedy.

Thus, in making a determination about how to condition the grant of ATI with respect to the carriers that should receive the divested slots, the Department "focused on providing access to MEX to carriers that do not have it, and have demonstrated that they cannot achieve it otherwise, in order for them to provide competitive service, disciplining the [Joint Venture]."[19] We therefore rejected Southwest's request that we limit eligibility for the divested slots only to U.S. Low Cost Carriers (LCCs), concluding that there was nothing in the record to persuade us of the benefits of categorically excluding Mexican LCCs. However, we went on to conclude that Interjet would be ineligible to receive divested MEX slots as part of the conditions of our slot remedy. Interjet was precluded because it already is the second-largest slot-holder at the airport (313 daily slots), with more than two-and-a-half times as many slots as its next closest competitor, Volaris (115 daily slots), [20] and "has over 26% of the slots at MEX, more by far than any other carrier besides Aeromexico."[21] Consequently, "Interjet does not need assistance to achieve competitive access at MEX; it already has it."[22] The Department made a similar determination at JFK by excluding JetBlue from eligibility to receive slots there.[23] The Department determined that JetBlue would provide effective competition to the joint venture based on its low-cost/low-fare business model; however, given its already large presence at JFK as the second-largest slot-holder, we excluded JetBlue from acquiring more JFK slots through this proceeding.[24]

We therefore sought proposals from eligible carriers to utilize the slots that would be divested at JFK and MEX as a condition of our ATI grant.[25] In our most recent Order to Show Cause, we tentatively proposed the assignment conditions for the 24 slot-pairs at MEX and four at JFK.[26] Consistent with our earlier decisions, we determined that we "would select proposals that provide the maximum competitive benefits possible from new (preferably daily) services to/from JFK and MEX, taking into account a carrier's ability to exercise competitive discipline" through various means.[27] We proposed to grant Interjet's full request, which is one slot pair at JFK, concluding that such a grant would serve competitive interests and benefit the public at that

---

[18] *Id.* at 15.

[19] *See* Order 2016-12-13 at 23.

[20] *See* Order 2016-11-2, Figure 6 at 24.

[21] *See* Order 2016-12-13 at 23.

[22] *Id.*

[23] *See* Order 2016-11-2 at 25.

[24] JetBlue did not object to this determination.

[25] *See* Order 2017-1-6, Jan. 6, 2017.

[26] *See* Order 2017-3-1, Mar. 2, 2017.

[27] *Id.* at 9-10.

airport. However, we found no basis to alter our prior determination that Interjet should not be permitted to obtain remedy slots at MEX.

**B. INTERJET'S OBJECTIONS**

As noted above, only Interjet objects to the terms set forth in the Department's Show Cause Order. Interjet does not object to the divestiture of slots as a competitive remedy *per se*. On the contrary, Interjet has previously stated in this proceeding that "[t]here is nothing improper with the Department's decision to condition the approval of ATI on the divestiture of as many slot-pairs at JFK and MEX as are needed" under the circumstances of the Joint Venture.[28] Instead, Interjet has largely reiterated the objections that it raised at earlier stages of this proceeding, which relate to the Department's decision to exclude it from obtaining MEX remedy slots.[29] The Department had previously considered and rejected those arguments.[30] However, in the interests of developing a full record and ensuring that all viewpoints are heard in the course of this process, the Department has reviewed Interjet's most recent submission on the merits. We remain unpersuaded and have concluded that Interjet's objections lack merit.

First, Interjet contends that the Department has exceeded its statutory jurisdiction in reaching its determination on the appropriate slot remedy.[31] The lynchpin of Interjet's argument is that the Department is effectively usurping the power of Mexican authorities, particularly Aeropuerto Internacional de la Ciudad de México (AICM) and Direccion General de Aeronautica Civil (DGAC), "to administer slot allocation at MEX."[32] But Interjet misinterprets the Department's decision and suggests a problem of comity that does not actually exist. As the Department has explained, it does not, and cannot, allocate slots at MEX. The Department has conditioned its discretionary grant of ATI on the Joint Applicants' divestiture of certain assets, as well as their transfer of those slots, in a manner that is compatible with Mexican laws and procedures; a condition that the Joint Applicants voluntarily accepted.[33] The onus is now on the Joint Applicants to comply with that condition. Although the Department has determined the carriers to which the Joint Applicants will transfer the slots, as set forth below, the ultimate approval of those slot transfers at MEX continues to rest with AICM. If the Joint Applicants do not obtain approval of the slot transfers, then the Department's grant of ATI will simply not enter into force.

Second, Interjet argues that its exclusion from the MEX slot remedy "does not advance a legitimate government interest in addressing antitrust concerns," and was otherwise arbitrary and

---

[28] *See* Reply of ABC Aerolineas, S.A. de C.V., d/b/a Interjet, DOT-OST-2015-0070-0095, Nov. 30, 2016, at 2.

[29] As noted above, Interjet fully supports the Department's determination with respect to the JFK slots, which included an approval of Interjet's request for one slot-pair. Interjet Comments and Objections at 1-2.

[30] *See* Order 2016-12-13 at 22-23.

[31] Interjet's argument does not, and cannot, make any such argument with respect to the divestitures of slots at a United States airport (here, JFK).

[32] Interjet Comments and Objections at 5.

[33] This divestiture is consistent with local rules as set out by AICM, the operator of MEX and entity responsible for allocating slots, as noted in its comments during the ATI proceeding.

capricious.[34] But Interjet continues to misinterpret the Department's decision and fails to explain how providing it with remedy slots would improve the competitive balance. The Department's objective in conditioning the grant of ATI, consistent with our statutory authority and Congress's objectives in ensuring the public interest, is to address the potential competitive harm of the Joint Venture by devising an "adequate and proportional remedy that addresses the barriers to entry in light of the specific facts and circumstances in the record."[35] The MEX slot divestiture is designed to "alleviate the immediate increase in concentration of slots," to reduce barriers to entry, and to "support new entry" by low-cost/low-fare carriers "with a limited presence, or no presence" at the airport. Based upon these objectives, the Department has appropriately tailored a remedy, and has exercised its discretion to limit eligibility to low-cost/low-fare carriers that are, in effect, new entrants or limited incumbents, and that could not launch substantial new services but for the remedy. Permitting Interjet to obtain the MEX remedy slots is totally at odds with those objectives. Given Interjet's status as the second-largest operator of slots at MEX by a wide margin, a different determination would worsen concentration at the airport and likely perpetuate the barriers to entry.

Third, contrary to Interjet's arguments, our determination is consistent with our past practices and with general principles of antitrust law, which are appropriate to consider as part of our analysis under the governing statutes.[36] As discussed above, the Department has employed slot divestitures in multiple instances in the past to address competition concerns, tailoring this action to the facts and circumstances of each particular case. Moreover, the Supreme Court has made clear that the government must fashion "effective" antitrust remedies to address competitive harm, including divestitures, even if such remedies may cause "economic hardship" to individual parties.[37] In this case, Interjet cannot even contend that our decision causes it any concrete economic harm at all; it merely complains that it will not be able to take advantage of the divested slots to *improve* its position relative to its competitors. Nothing in the governing law supports such an argument. On the contrary, our decision is consistent with the formal guidance provided by the Department of Justice merger remedies, in which it has explained the importance of "remedies that protect the competitive landscape" as a whole.[38]

Next, Interjet argues that the decision to exclude it is arbitrary. Interjet focuses on the Department's assessment that the carrier already has sufficient slots that it could use to serve the U.S.-Mexico market if it wishes. Interjet asserts that the Department has not supplied any data or information to support its position. Regardless of whether the Department is required to do so, we did supply two relevant data points that were debated extensively in the record and

---

[34] *See* Interjet Comments and Objections at 3-5.

[35] *See* Order 2016-11-2 at 20.

[36] *See, e.g.*, 49 U.S.C. § 41308(a) (referencing the Clayton Act).

[37] *U.S. v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 323-24 (1961); *see also ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 571 (6th Cir. 2014) (discussing the importance of protecting consumer welfare through antitrust remedies).

[38] United States Department of Justice, *Antitrust Division Policy Guide to Merger Remedies* at 2-3 (June 2011), *available at* https://www.justice.gov/sites/default/files/atr/legacy/2011/06/17/272350.pdf (DOJ Policy Guide) (emphasis added). Indeed, the Justice Department explicitly recognizes the efficacy of divestiture as just such a remedy in appropriate circumstances. *Id.*

published in the ATI Show Cause Order. First, Interjet operates more than 25% of the slots at MEX.[39] Second, incumbents at MEX, including Interjet, do not use 37% of their slots on average.[40] Interjet did not dispute either of those data points, which are derived from official Mexican sources. Both data points support the notion that Interjet already has a sufficient number of slots to serve the transborder market if it were profitable to do so. We note that Interjet appears to be pursuing such a strategy, as one industry source reports that Interjet is increasing capacity to the United States.[41]

The Department's approach in using data to inform its eligibility determination was neither arbitrary nor capricious. The ATI Show Cause Order described the number of peak-day operations at MEX and JFK for all relevant carriers providing transborder service. The figures showed a statistical break between carriers who had a large number of slots and low-cost/low-fare carriers who had measurably fewer slots with which they could respond to the proposed joint venture. The Department used the same non-discriminatory approach at MEX and JFK, excluding Mexican carrier Interjet (313 daily slots) from applying for MEX remedy slots and U.S. carrier JetBlue (335 daily slots) from applying for JFK remedy slots. The Department had a basis for its decision and it applied it consistently in like circumstances.

Finally, the principal authority that Interjet cites in support of its arguments, *United States v. Aluminum Co. of America* (*Alcoa*), is not to the contrary. In that case, the Second Circuit stated that "[t]he successful competitor, having been urged to compete, must not be turned upon when he wins."[42] But Alcoa involved a question that is not at issue here—whether the defendant company was guilty of "monopolizing" a particular market in violation of section 2 of the Sherman Antitrust Act. In the course of finding that the defendant was indeed guilty of such a violation, the Court conceded that a company enjoying monopoly power might not be liable if it had become a monopolist "by force of accident" and "without having intended either to put an end to existing competition, or to prevent competition from arising"; the language cited by Interjet is part of that discussion in the case.[43] In all events, the case lacks force here. The Department has not suggested that Interjet's market position is illegal or wrongful; instead, it has merely taken that market position, second only to Aeromexico's at MEX, into account in deciding that awarding Interjet additional slots would not further the interests of competition. The Department's decision was based solely on the fact of Interjet's market position and how it factored into our decision to fashion the competitive remedy.[44]

---

[39] *See* Order 2016-11-2, Figure 6 at 24.

[40] *See* COFECE Report Translation, DOT-OST-2015-0070-0037, Jun. 1, 2016 at 20.

[41] *See* "Interjet Moves Forward in Strengthening its Transborder Position. Politics Spurs Market Uncertainty," CAPA Centre for Aviation, March 25, 2017, *available at* https://centreforaviation.com/analysis/interjet-moves-forward-in-strengthening-its-transborder-position-politics-spurs-market-uncertainty-333938.

[42] 148 F.2d 416, 430 (2d Cir. 1945).

[43] *See id.* at 429-30.

[44] The Department has also considered Interjet's other arguments and continues to find them unpersuasive. In particular, the Department disagrees with Interjet's contentions relating to its ability to repurpose its slots at MEX for international use. *See* Interjet Comments and Objections at 3-5. As

## V. DECISION

The Department is here continuing the process begun with our examination of the Joint Applicants' request for ATI. As noted in the ATI Final Order, Step 3 of the process is "DOT selects eligible carriers to receive remedy slots in show-cause and final orders."[45] In the ATI Show Cause Order we said of remedies:

> Where new entry would not otherwise be sufficient to address competitive harm, or where there are external factors such as infrastructure constraints in the marketplace that exacerbate competitive harm, remedies may be necessary to address potential competition problems caused by the alliance.[46]

In addition, we said in the ATI Final Order:

> The Department must, in order to protect the public interest, not examine just the effects of the proposed alliance, but also the environment in which the alliance will operate, to ensure that there will be adequate competition to not only mitigate any potential harm from the proposed transaction, but to guarantee that the anticipated public benefits are likely to be realized. The Department did conduct an in-depth competitive effects analysis, including but not limited to the Clayton Act test, to assess market power and the likelihood of potential new entry in key markets. The Department determined that the Joint Applicants would be able to exert market power between the United States and MEX, and that, without divestitures, new entry is unlikely to occur. The record in this case clearly demonstrates that MEX is a primary market, particularly for transborder air service in Mexico.[47]

After reviewing the comments and responsive pleadings that have been filed, the Department is largely adopting the assignments it tentatively proposed in the Show Cause Order, with one change to the assignment of JFK slots. The Department believes that finalizing the tentative decisions set out in the Show Cause Order will achieve the goals set out in our previous Orders. Indeed, apart from the objections of Interjet, discussed above, we have received no significant objection to what we had proposed, and we conclude that moving expeditiously to effect the Joint Application and the accompanying conditions, including the slot remedy, will benefit the public. Accordingly, the Department has decided upon the following slot assignments:

---

discussed above, the Department has carefully considered Interjet's market position, and the competitive situation as a whole, at MEX, and taken those into account in reaching its decision.

[45] *See* Order 2016-12-13 at 31.

[46] *See* Order 2016-11-2 at 9.

[47] *See* Order 2016-12-13 at 19 (citation omitted).

At MEX:[48]

- **Alaska**:
  - 2 slot-pairs for service to LAX – Phase One
  - 1 slot-pair for service to SFO – Phase One
  - 1 slot-pair for service to SAN – Phase One
- **JetBlue**:
  - 2 slot-pairs for service to FLL – Phase One
  - 2 slot-pairs for service to MCO – Phase One
  - 2 slot-pairs for service to LAX – Phase Two
- **Southwest**:
  - 2 slot-pairs for service to HOU – Phase One
  - 1 slot-pair for service to FLL – Phase Two
  - 1 slot-pair for service to LAX – Phase Two
- **Volaris**:
  - 1 slot-pair for service to SAT – Phase One
  - 1 slot-pair for service to JFK – Phase One
  - 1 slot-pair for service to LAX – Phase One
  - 1 slot-pair for service to DEN – Phase Two
  - 1 slot-pair for service to IAD – Phase Two
  - 1 slot-pair for service to SJC – Phase Two
  - 1 slot for service to ONT – Phase Two[49]
  - 1 slot for service to ORD – Phase Two
  - 1 slot for service to OAK – Phase Two
- **VivaAerobus**
  - 1 slot-pair for service to LAS – Phase One
  - 2 slot-pairs for service to JFK – Phase Two

At JFK:[50]

- **Interjet:**
  - 1 slot-pair for service to MEX – Phase One
- **Volaris:**
  - 1 slot-pair for service to MEX – Phase One
  - 1 slot for service to CUN – Phase Two
- **VivaAerobus:**
  - 3 slots for service to MEX – Phase Two

As discussed in the Show Cause Order, both of VivaAerobus' Phase Two requests require slots

---

[48] Specific slot times can be found in Table 1 in Appendix A. When applying the provisions of Appendix B, section 2.f, the Joint Applicants must take into account Alaska's aircraft rotation, as detailed in their application.

[49] Volaris will operate 3 times per week to ONT and to SJC 4 times per week. The Department is not granting the slot that Volaris requested for an arrival at MEX at 0655 as it is outside of the saturated hours at MEX.

[50] Specific slot times can be found in Table 2 in Appendix A.

in the protected hours at JFK.[51] Our Phase One award of JFK slots to Interjet fully satisfies the established limit on divestitures in these hours. As such, in the Show Cause Order we directed VivaAerobus to submit a revised request, seeking slot-times at JFK that are outside of the protected hours. VivaAerobus complied and submitted a request for JFK slots at 1325/1455 and 0500/0900 (arrival/departure). VivaAerobus also requested that the Department allow it to switch its second JFK slot-pair to LAX.

By selecting VivaAerobus' revised JFK slot-times, the Department is able to accommodate Volaris' original JFK-CUN request. VivaAerobus' revised slot-times require only three slots for its operations, as its requested 0500 arrival at JFK is outside of the airport's slot-controlled hours. Likewise, Volaris requested JFK slots at 0700 and 2300 for its proposed CUN service. 2300 is also outside of the slot-controlled hours at JFK. Therefore, Volaris requires only one slot (at 0700) to operate the service. As there are no other competing requests for the available JFK slots, the Department will assign the remaining JFK slot made available by VivaAerobus' revised request to Volaris for service to CUN.

The Department denies VivaAerobus' request to move its second JFK service to LAX. The Department noted the importance of the JFK-MEX nonstop overlap route in crafting its remedy. The ATI Show Cause and Final Orders noted that JFK-MEX is a nonstop overlap market that raises competitive concerns, requiring a route-specific remedy. The importance of this market was discussed in detail in the ATI phase of this proceeding. This is in large part why VivaAerobus' second proposed JFK-MEX service was originally chosen over a competing request for JFK-CUN service by Volaris. The Department has established procedures, discussed further below, to change the destination of a slot awarded through this proceeding. VivaAerobus may transfer its JFK slots to another eligible carrier if it no longer wishes to utilize them per the procedures discussed below.

## VI. IMPLEMENTATION

As required by the ATI Final Order, the Joint Applicants must enter into slot transfer arrangements with the Phase One slot recipients that are consistent with the requirements of this Order and submit those agreements to the Department for approval. The slot transfer arrangements (including, but not limited to, the slot transfer agreements) should ensure that the recipient carriers receive slots that are free of any financial, operational, or other encumbrances, and that the recipients' desired start dates – provided that they are reasonable – are accommodated. Specifically, the transfer arrangements must provide for an unencumbered start-up period, such as a waiver from applicable use-or-lose rules. All parties are encouraged to approach the relevant authorities, including the slot administrators, to ensure proper transfer. Once the agreements are approved by the Department, the Joint Applicants must submit a notice in the docket indicating the date that the Phase One slot transfer agreements have been executed and approved by the respective slot coordinators, and the date that the joint venture will be implemented. The ATI will become effective once this and all other required notices have been received, and all requirements of the ATI Final Order have been completed.

---

[51] Order 2016-12-13 established protected hours at JFK of 1500-2059, during which the Joint Applicants would only be required to divest a maximum of two slots. *See* Order 2016-12-13 at 25.

Recipients of Phase Two slots must submit a timely, written request to the appropriate slot administrator(s) detailing the slots requested, and should also file those requests in this docket.[52] If they do not receive a complete response, or are not granted slots within a 60-minute window of their requests by November 21, 2017, the carriers must notify the Department, at which time it will consider the recipient carrier(s) to have exhausted all reasonable efforts to obtain slots.[53] At that point, the Joint Applicants' obligation to transfer remedy slots as a condition of maintaining their antitrust immunity will be triggered. The Department will provide timely notice to the Joint Applicants if they are obligated to provide these remedy slots. It would be prudent for the recipient carriers to notify the Joint Applicants of their Phase Two timing requests to AICM and the FAA, and for the Joint Applicants to identify appropriate slots and prepare for a potential slot transfer, prior to the November 21, 2017, deadline. We also here reiterate our requirement that carriers receiving JFK slots will have to demonstrate that they have exhausted reasonable efforts to seek accommodation for terminal space and other necessary infrastructure, including by availing themselves of any applicable lease terms at JFK. Should they prove unable to find adequate accommodation, the Joint Applicants will be expected to provide it.[54]

## VII. CONDITIONS PERTAINING TO REMEDY SLOTS

One commenter, Southwest, affirmatively praised the Department's tentative decision to place certain restrictions on the future lease, trade, or transfer of slots assigned through this proceeding. No commenters objected. We therefore make final the conditions proposed in the Show Cause Order concerning future leases, trades, or transfers of the remedy slots. Specifically, as noted in Appendix B, the parties are obligated to introduce services consistent with their proposals.[55] In the event that carriers desire to change destinations, they must only provide the Department with at least 14 calendar days' advance notice in writing. If the Department takes no action after 14 days, the new destination will be deemed approved.

Also, as noted in Appendix B, recipients are bound to adhere to the respective jurisdiction's use-or-lose requirements so that these valuable slots are not forfeited. The Department will permit only occasional short-term leases of less than one IATA scheduling season in order to accommodate an operational need, provided the slots continue to be used for transborder services. Recipient carriers must notify the Department of such leases. Carriers may trade the slots with other carriers, consistent with local airport rules, such as to improve operational times; however, the terms and conditions of the Department's Order(s) and the slot transfer agreements will apply to the newly acquired slots. If a carrier wishes to transfer a slot(s) permanently, it must notify all carriers deemed eligible in this proceeding that the slot(s) are available, with copies of such notifications to the Department.[56,57] When it reaches an agreement to transfer slots to another eligible carrier, the carrier must notify the Department and seek its prior approval

---

[52] Carriers may submit a redacted version that omits any sensitive commercial information to the docket. However, they should submit an un-redacted version to the Director, Office of Aviation analysis.

[53] *See* Order 2017-1-6, footnote 1 at 2.

[54] *See* Order 2016-12-13 at 26.

[55] *See* Appendix B, Section 2b.

[56] Eligible carriers are those listed in footnotes 59 and 61 of Order 2016-11-12.

[57] All notifications in this section shall be made to the Director, Office of Aviation Analysis.

before executing the transfer.[58] The Department has determined that, for the five-year period in which the antitrust immunity granted by the ATI Final Order is effective, no compensation will be permitted for the lease, trade, or transfer of remedy slots.

These same restrictions and processes will apply to Phase Two assignments as well. If a carrier no longer wishes to acquire a Phase Two slot it has been awarded through this proceeding, it must notify the Department and all other eligible carriers at least 45 days prior to the start of the Summer 2018 IATA Slot Conference. When the carrier reaches an agreement with another eligible carrier to transfer the slot(s) (or the rights to the slot(s)), it must seek the Department's approval before executing the transfer. If a carrier wishes to change the destination of a Phase Two assignment prior to acquiring the slot either from the slot administrator or through divestiture, the carrier must submit written notice to the Department 45 days before the start of the Summer 2018 IATA Slot Conference.[59] The request shall be deemed approved if the Department takes no action within 14 days of the notice, and the carrier may proceed with its request for the new destination.

As with Phase One slots, the Department intends to permit only short-term leases without compensation of less than one IATA scheduling season in order to accommodate an operational need, as long as the slots continue to be used for transborder services. Recipient carriers will need to notify the Department of such leases. Likewise, carriers may trade Phase Two slots, consistent with local airport rules, such as to improve operational times; however, the terms and conditions of the Department's Order(s) and the slot transfer agreements will apply to the newly acquired slots. Carriers may also transfer Phase Two slots without compensation to other eligible carriers under the same procedures as for Phase One slots: the transferring carrier must notify all carriers deemed eligible in this proceeding that the slot(s) are available, with copies of such notifications to the Department.[60,61] When the transferring carrier reaches an agreement to transfer with another eligible carrier, it must notify the Department and seek its prior approval before executing the transfer.[62]

We are also adopting the suggestion of Volaris that should a carrier selected to receive both Phase One and Phase Two slots fail to properly utilize its Phase One slots in conformity with local rules and/or the terms and conditions established in this Order, the Department may revisit its Phase Two decision with regard to that carrier.

Finally, we note that although the grant of ATI and the conditions that we have imposed here are appropriate, we have deliberately limited the ATI grant to a period of five years to account for changing circumstances. We anticipate that, at a minimum, we will receive further evidence and viewpoints from stakeholders well in advance of the end of that five-year period to begin our

---

[58] Permanent transfers can only be made to a carrier eligible to participate as an applicant in this proceeding.

[59] The Summer 2018 IATA Slot Conference begins on November 7, 2017.

[60] Eligible carriers are those listed in footnotes 59 and 61 of Order 2016-11-12.

[61] All notifications in this section shall be made to the Director, Office of Aviation Analysis.

[62] Permanent transfers can only be made to a carrier the Department has deemed eligible in this proceeding.

determination of whether the Joint Venture should be permitted to continue, if the parties do indeed seek to continue it. In addition, as in all such cases, the Department always retains the authority, even during the five-year ATI period, to entertain requests to re-open this proceeding, or to institute a new proceeding, should we become aware of circumstances that make it appropriate for us to revisit the issues here, to modify the conditions that we have attached to our grant of ATI, or to otherwise protect the integrity of our ruling.[63]

**ACCORDINGLY:**

1. We determine that, as a condition to our grant of Antitrust Immunity (ATI), the Joint Applicants shall transfer 14 slot-pairs at Mexico City's Benito Juarez International Airport (MEX) and two slots pairs at New York's John F. Kennedy International Airport (JFK), as were required to be divested by Order 2016-12-13 as Phase One slot-pairs, at the times and to the carriers as described above and in Appendix A, and in accordance with the conditions described in Appendix B and the body of this Order;

2. We conclude, that as a condition to the grant of ATI, the remaining 10 slot-pairs at Mexico City's Benito Juarez International Airport (MEX) and two slots pairs at New York's John F. Kennedy International Airport (JFK), as were required to be divested by Order 2016-12-13 as Phase Two slot-pairs, should be assigned at the times and to the carriers as described above and in Appendix A, and in accordance with the conditions described in Appendix B and the body of this Order. We determine that the carriers assigned Phase Two slots, at the times described in Appendix A, must submit timely and complete requests for their assigned slots to the slot administrators at MEX and JFK, and provide copies of those requests and assignments to the Department;

3. We determine that if the carriers assigned Phase Two slots have complied with ordering paragraph two, and have not received commensurate slots from the slot administrators at MEX and/or JFK by November 21, 2017, the Joint Applicants shall be required to transfer the remaining slots, at the times and to the carriers described in Appendix A, and in accordance with the conditions described in Appendix B and the body of this Order;

4. We determine that carriers wishing to change the destination of a slot assigned by this Order shall seek the Department's approval by providing the Department at least 14 calendar days' notice of the desired change. If the Department takes no action within 14 calendar days the change will be deemed approved;

5. We determine that slots assigned by this Order may be leased for a period of less than one IATA scheduling season if necessary to meet operational needs. A copy of all such leases must be provided to the Department;

6. We determine that slots assigned by this Order may be traded by carriers in order to improve operational times, provided that all terms and conditions follow to the newly acquired slot(s). Notifications of such trades shall be provided to the Department;

---

[63] *See* DOJ Policy Guide at 33 (noting the importance of an oversight and enforcement mechanism for ensuring that tailored antitrust remedies are carried out appropriately).

7. We determine that slots assigned by this Order may be permanently transferred to another carrier deemed eligible to acquire slots through this proceeding. Prior to the transfer, the transferring carrier must notify all carriers deemed eligible in this proceeding that the slot(s) are available and provide the Department with copies of those notifications. Upon reaching an agreement with another eligible carrier, the transferring carrier must seek Departmental approval before executing the transfer;

8. We determine that a carrier assigned a Phase Two slot(s) that no longer wishes to utilize the slot(s) before it is acquired must follow the procedures described in ordering paragraph seven to transfer the Phase Two assignment;

9. We determine that no compensation may be exchanged for leases, trades, or transfers of slots assigned by this Order during the five-year period in which the antitrust immunity granted by Order 2016-12-13 is effective;

10. We determine that carriers assigned Phase One or Phase Two remedy slots at JFK will need to exhaust all reasonable efforts to acquire necessary facilities and services at the airport. If a carrier demonstrates to the Department that it has exhausted all reasonable efforts, but has been unable to obtain the minimum access it requires to introduce service with the remedy slots, the Joint Applicants shall be responsible for accommodating the Selected Carrier to the extent necessary to allow for commercially viable operations.

11. We reserve the right to revisit our Phase Two assignments for any carrier that forfeits a Phase One assigned slot due to a violation of local slot usage rules, or otherwise violates the terms of this Order;

12. We determine that the terms and conditions described in the body of this Order and Appendix B shall apply to recipients of the transferred slots or rights to slots, including any subsequent transferee(s) of slots or rights to slots assigned in this proceeding;

13. We will serve this Order on all parties on the service list for this docket.

By:

**SUSAN MCDERMOTT**
Deputy Assistant Secretary for
Aviation and International Affairs

(Seal)

*An electronic version of this document is available online at* www.regulations.gov.

## MEX Slot Assignments

| Carrier | Phase One | | | Phase Two | | |
|---|---|---|---|---|---|---|
| | Market | Slot Time @ MEX | Count | Market | Slot Time @ MEX | Count |
| Alaska | LAX | 1400 | 1 | | | |
| | | 1735 | 1 | | | |
| | LAX | 1800 | 1 | | | |
| | | 1335 | 1 | | | |
| | SFO | 1635 | 1 | | | |
| | | 1500 | 1 | | | |
| | SAN | 1245 | 1 | | | |
| | | 1850 | 1 | | | |
| Southwest | HOU | 2050 | 1 | FLL | 1245 | 1 |
| | | 0700 | 1 | | 1340 | 1 |
| | HOU | 1045 | 1 | LAX | 2200 | 1 |
| | | 1140 | 1 | | 0750 | 1 |
| JetBlue | FLL | 0925 | 1 | LAX | 1315 | 1 |
| | | 1030 | 1 | | 1420 | 1 |
| | MCO | 1101 | 1 | LAX | 1745 | 1 |
| | | 1206 | 1 | | 1850 | 1 |
| | MCO | 1438 | 1 | | | |
| | | 1543 | 1 | | | |
| | FLL | 1603 | 1 | | | |
| | | 1710 | 1 | | | |
| VivaAerobus | LAS | 1935 | 1 | JFK | 0700 | 1 |
| | | 1035 | 1 | | 1915 | 1 |
| | | | | JFK | 2255 | 1 |
| | | | | | 1300 | 1 |
| Volaris | JFK | 0759 | 1 | OAK | 1850 | 1 |
| | | 1839 | 1 | | | |
| | SAT | 1200 | 1 | DEN | 1005 | 1 |
| | | 1720 | 1 | | 1840 | 1 |
| | LAX | 1000 | 1 | ONT | 2100 | .5 |
| | | 1925 | 1 | | | |
| | | | | SJC | 1100 | 1 |
| | | | | | 2139 | .5 |
| | | | | ORD | 1905 | 1 |
| | | | | | | |
| | | | | IAD | 1100 | 1 |
| | | | | | 2151 | 1 |
| | | Total Slots Phase One | 28 | | Total Slots Phase Two | 20[64] |

64 Volaris will use one Phase Two slot to operate ONT three days per week and SJC four days per week.

| JFK Slot Assignments | | | | | | |
|---|---|---|---|---|---|---|
| | Phase One | | | Phase Two | | |
| Carrier | Market | Slot Time @ JFK | Count | Market | Slot Time @ JFK | Count |
| Interjet | MEX | 1625 | 1 | | | |
| | | 1740 | 1 | | | |
| VivaAerobus | | | | MEX | 1325 | 1 |
| | | | | | 1455 | 1 |
| | | | | MEX | 0900 | 1 |
| Volaris | MEX | 1339 | 1 | CUN | 0700 | 1 |
| | | 1459 | 1 | | | |
| | Total Slots Phase One | | 4 | Total Slots Phase Two | | 4 |

## SLOT DIVESTITURES

In consideration of United States Department of Transportation ("DOT") approval of the alliance agreements submitted in Docket DOT-OST-2015-0070, and a grant of antitrust immunity, Delta Air Lines, Inc. and Aerovias de Mexico, S.A. (together, the "Joint Applicants") commit to transfer to eligible competitors certain landing and takeoff authorizations ("slot-pairs" or "slots"[65]) at Mexico City's Benito Juarez International Airport ("MEX") and New York's John F. Kennedy International Airport ("JFK"). The Joint Applicants shall transfer the slot-pairs for use in the United States-Mexico air services market subject to terms and conditions specified in the attached Final Order, in this Appendix, and in subsequent notices or orders published in the docket. DOT's notices or orders will determine the eligibility of competitors to receive the slot-pairs and make selections for the Joint Applicants to follow. Each eligible competitor receiving slot-pairs ("Selected Carrier") shall comply with the terms and conditions applicable to the request, receipt, use, and subsequent transfer of the slot-pairs.

### 1. Number of Slot-pairs

a. **MEX** - The Joint Applicants shall make available to eligible competitors twenty-four (24) slot-pairs for year-round use at MEX in two phases:
   i. **Phase 1** - Fourteen (14) slot-pairs shall be transferred as soon as practicable in time for use in the International Air Transport Association ("IATA") Northern Summer 2017 season;
   ii. **Phase 2** - Ten (10) slot-pairs shall be transferred in time for use in the IATA Northern Summer 2018 season and shall be subject to the exhaustion of efforts requirements in Section 2.h.

b. **JFK** – The Joint Applicants shall make available to eligible competitors four (4) slot-pairs for year-round use at JFK in two phases:
   i. **Phase 1** - Two (2) slot-pairs shall be transferred as soon as practicable in time for use in the IATA Northern Summer 2017 season;
   ii. **Phase 2** - Two (2) slot-pairs shall be transferred in time for use in the IATA Northern Summer 2018 season and shall be subject to the exhaustion of efforts requirements in Section 2.h.

### 2. Terms and Conditions

a. **Slot Transfer Agreements** – The Joint Applicants shall meet the terms and conditions of the slot divestiture, and arrange for the transfer of the slot-pairs, by entering into a Slot Transfer Agreement with each Selected Carrier. The Joint Applicants shall meet deadlines, and submit slot transfer agreements to DOT for prior approval, as follows:

---

[65] A "slot-pair," consisting of two slots, enables one round-trip operation at slot-controlled airports. One slot is used for landing and the other for takeoff.

i. **Deadlines** – The Joint Applicants shall conclude slot transfer agreements with each Selected Carrier by deadlines established by DOT in notices or orders published in the docket. DOT may also establish deadlines in notices or orders by which Selected Carriers must demonstrate that they have exhausted efforts to obtain slots as provided under Section 2.h.

ii. **Prior Approval** – Prior to execution, each slot transfer agreement shall be submitted to DOT for prior approval.

b. **Transborder Service** –MEX slot-pairs shall be used by Selected Carriers to provide nonstop service between MEX and U.S. airports, consistent with proposals made to DOT during the selection process. JFK slot-pairs shall be used by Selected Carriers to provide nonstop service between JFK and Mexican airports, consistent with proposals made to DOT during the selection process.

c. **Free and Permanent Transfer** – The slot-pairs shall be transferred to Selected Carriers permanently, irrevocably, and free of charge (without cash or non-cash consideration).

d. **Compliance with Usage Rules, Regulations, and Operational Requirements** – The Joint Applicants shall transfer slot-pairs that meet usage rules, regulations, and operational requirements imposed by slot administrators at MEX and JFK, respectively, such that the slot-pairs are not subject to withdrawal during or after the end of the scheduling season by virtue of any actions or omissions of the Joint Applicants. Selected Carriers shall comply with the same usage rules, regulations, and additional requirements on an ongoing basis for the duration of the terms and conditions as set forth in Section 5.

e. **Historical Priority** – The Joint Applicants shall transfer slot-pairs which, based upon local rules, are eligible for historical priority such that Selected Carriers may be expected to obtain such historical priority in the following corresponding seasons. For the duration of the terms and conditions of the slot divestiture, as set forth in Section 5, the Selected Carriers shall maintain historical priority for remedy slot-pairs.

i. **Ability to Improve Times** - Once the slot-pairs have been transferred by the Joint Applicants, no prior approval from DOT is necessary if Selected Carriers wish to work with the slot administrator or other operators at the airports to improve the timing of the slot-pairs to meet commercial needs.

f. **Preferred Times** –DOT may require eligible competitors to include preferred times in their requests for remedy slots. Subject to the hourly limits in Section 2.g., DOT may direct the Joint Applicants to transfer slots at or near the times requested by the eligible competitors. To facilitate the transfer process and fulfillment of the goals of the remedy, the Joint Applicants shall make reasonable efforts to identify and transfer slots that meet, as closely as possible, the timing requests of the Selected Carriers. DOT may require the Joint Applicants to meet

the timing requests for each slot in a slot-pair within a sixty (60) minute window, subject to the hourly limits in Section 2.g. If the Joint Applicants do not have slots within the +/- sixty (60) minute window, DOT may require the Joint Applicants to offer to transfer the slots closest in time to the Selected Carriers' requests. The arrival and departure slot times shall allow for reasonable aircraft rotation taking into account standard industry practice for international flights, terminal requirements, and the Selected Carrier's business model, including aircraft utilization requirements.

g. **Hourly Limits** – For both Phase 1 and Phase 2 slots, the Joint Applicants shall use reasonable efforts to accommodate the timing requests of the Selected Carriers during hours declared as saturated or slot controlled by the airport authorities.

   i. **MEX** – At MEX, the Joint Applicants shall not be obligated to transfer more than six (6) slots per hour during hours that the airport authority has declared as saturated, provided, however, that the Joint Applicants may designate two (2) non-consecutive hours during the saturated period in which they will not be obligated to transfer more than four (4) slots per hour, in order to minimize disruptions to the Joint Applicants' banking of flights.

   ii. **JFK** – At JFK, the Joint Applicants shall not be obligated to transfer more than 2 slots per hour. During the 15:00-20:59 period, the Joint Applicants shall not be obligated to transfer more than 2 slots total.

h. **Exhaustion of Efforts to Obtain Slots** – The Phase 2 slot-pairs for both MEX and JFK are subject to the obligation of Selected Carriers to exhaust reasonable efforts to obtain slots from the slot administrators of the airports prior to making a request of the Joint Applicants. Selected Carriers shall apply to the slot administrators with specific timing requests. The requests shall, to the maximum extent possible, comply with local rules and shall be submitted on a timely basis, provided that the Selected Carriers receive notice of pertinent deadlines in advance. Selected Carriers shall be deemed to have exhausted all reasonable efforts, and the Joint Applicants shall be liable to divest the requisite amount of Phase 2 slots to satisfy the selections made by DOT, where: (1) the Selected Carrier submits evidence to DOT that it requested slot-pairs in writing on a timely basis and received no response or an incomplete response, or (2) the Selected Carrier submits evidence to DOT that it requested slot-pairs in writing on a timely basis and did not receive the slots it requested within a sixty (60) minute window (+/- 60 minutes from the request). Selected Carriers have until the deadlines provided in Section 2.a.i. to demonstrate that they exhausted all reasonable efforts. Pending the outcome of the exhaustion of efforts requirement, the Joint Applicants shall identify appropriate Phase 2 slots for potential timely transfer to

Selected Carriers. DOT's written notice to the Joint Applicants that DOT has accepted a Selected Carrier's demonstration of exhaustion of efforts shall constitute a final decision that requires the Joint Applicants to transfer the requisite number of Phase 2 slots necessary to satisfy the selections made by DOT, subject to the terms and conditions of the slot divestiture.

i. **Access to Facilities and Services** – Selected Carriers intending to serve JFK and/or MEX using remedy slots shall use reasonable efforts to obtain access to facilities and services which are normally provided by the airport authorities at MEX and JFK and which are necessary to sustain the air service. Such facilities and services include, but are not limited to, gates, terminal space, ticket and boarding areas, and, if needed, permission and parking to Remain Over Night/ RON. Reasonable efforts require Selected Carriers, at a minimum, to work with the airport authorities to identify available space and accommodation and, if necessary, to avail themselves of forced accommodation provisions in applicable use and lease agreements at the relevant airport. If a Selected Carrier demonstrates to DOT that it has exhausted all reasonable efforts, but has not been able to obtain the access it requires at a minimum to introduce service with the remedy slots, the Joint Applicants shall be responsible for accommodating the Selected Carrier to the extent necessary to allow the services to operate in a commercially viable fashion. Nothing in this subsection shall be construed to require the Joint Applicants or any airport authority to provide access to facilities or services at rates below market levels or below charges established by accommodation provisions in existing airport use and lease agreements.

j. **Non-Interference** – The Joint Applicants shall not take any action that could in any way impede Selected Carriers from obtaining permits or authorizations, or interfere with eligible competitors' operations.

k. **Necessary Approvals and Authorizations** – Selected Carriers shall make reasonable efforts to obtain the necessary safety and economic authority from the Governments of the United States and Mexico to launch the new transborder services in a timely manner. Selected Carriers shall notify DOT if they face unreasonable delays.

l. **Duty to Provide Information to DOT** – The Joint Applicants shall respond promptly to information requests by the Department to facilitate the transfer of slot-pairs. Such requests may include, but shall not be limited to, the amount of slots held at MEX or JFK in total and/or by hour, any specific information corresponding to slots such as number or assigned times, and recorded usage of specific slots.

### 3. Eligibility and Selections

The Joint Applicants shall transfer slot-pairs consistent with the selections made by DOT by order(s) in the docket. DOT may select among competitors it deems eligible through notices or orders published in the docket, subject to the subsequent transfer and reassignment provisions in Section 4, below.

a. **Requests** – DOT may publish notices or orders in the docket to request proposals to obtain the slot-pairs made available by the slot divestiture. In such notices or orders, DOT may request that eligible competitors provide the key terms of their requests, including the requested timings, the number of frequencies, the routes intended to be served, proposed start date and schedule, and the aircraft intended to be operated, as well as a business and operational plan, including pricing structure, service offerings, and transborder network plan.

b. **Selections** – DOT may establish a ranking of the requests and propose the Selected Carriers, including primary and backup recipients.

### 4. Subsequent Transfers and Reassignment

Selected Carriers shall seek prior approval from DOT to transfer to third party airlines any slot-pairs obtained from the Joint Applicants as part of the slot divestiture. Any such subsequent transfers shall not include cash or non-cash consideration for the duration of the terms and conditions set forth in Section 5.

### 5. Duration

Although the Joint Applicants' transfer of slots to Selected Carriers is permanent, as required by Section 2.c., the terms and conditions of the slot divestiture apply to the Joint Applicants and Selected Carriers for a period of five (5) years from the date on which the Joint Applicants' antitrust immunity becomes effective. The terms and conditions apply for an initial five-year period from the date on which the Phase 1 slot-pair transfers are completed and the antitrust immunity becomes effective under the terms of a Final Order, and not beyond that initial period should the Joint Applicants re-apply for, and obtain, a further grant of antitrust immunity.